UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRUNG LE,<br><br>   Plaintiff,<br><br>  v.<br><br>AMERICAN SEAFOODS COMPANY LLC, et al.,<br><br>   Defendants. | CASE NO. C06-130JLR<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came for a bench trial that began on December 3, 2007. Plaintiff Trung Le was represented by Arnold Berschler of Berschler Associates, P.C., San Francisco, California and Wayne Mitchell of Bellevue, Washington. Defendants were represented by Eric McVittie and Robert Zarkos of LeGros, Buchanan & Paul, Seattle, Washington. At the conclusion of the case, the court took the case under advisement. After considering the testimony and exhibits submitted at trial and the written and oral arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law.

ORDER – 1

## I. Findings of Fact

1. Defendants, American Seafoods Company, LLC and Northern Jaeger, LLC (collectively "ASC") are limited liability companies organized under the laws of the State of Delaware that conduct business in the Western District of Washington. At all relevant times, ASC was the operator of the F/T NORTHERN JAEGER ("JAEGER"), a fishing tender that processes seafood products.

2. Plaintiff Trung Le is 31 years old and emigrated from Vietnam in March 2000. In mid-2001, Le began working as a seafood processor aboard the JAEGER.

3. On February 17, 2005, Mr. Le was assigned to the JAEGER's box elevator ("boxilator"), an enclosed vertical conveyor that carries boxes of frozen product from the freezer hold to the upper deck, during the vessel's offload in Dutch Harbor, Alaska. Mr. Le was working in the freezer hold on the left, or control side, of the boxilator. The control side is equipped with an emergency stop button and an intercom between the freezer and the upper deck. Fellow crewmember, Danny Mills, was assigned to the right, non-control side of the machine. Based on their positions, Mr. Le was using his right arm and Mr. Mills was using his left arm to guide the boxes.

4. That day Mr. Le dislocated his right shoulder while working at the boxilator. The parties disagree about how the injury occurred, whether the shoulder injury continues to affect Mr. Le's ability to work, and whether Mr. Le's left ear was damaged during the same incident.

5. No witness saw Mr. Le fall and/or strike his head and/or ear on February 17, 2005.

6. Mr. Le immediately reported his shoulder injury to second-mate/purser Charlie Dietrich and received onboard treatment. He did not tell Mr. Dietrich that he had injured his head or ear. Mr. Dietrich then drove Mr. Le to the Illiuliuk Clinic in Dutch Harbor,

ORDER – 2

where the dislocation was reduced. During treatment, Mr. Le never complained of a head or ear injury.

7.  After Mr. Le was released from the clinic, Alan Davis, ASC's Safety and Compliance Officer, transported him to the vessel to pick up his personal effects and then brought him to a hotel to rest until his flight to Seattle for treatment left early the next morning. Mr. Le told Mr. Davis about an "old issue" with hearing loss but never said that falling in the freezer hold caused his hearing loss. Mr. Davis filled out an accident report setting forth Mr. Le's version of the incident: "Box Fell From Boxilator, Reached down For it & Fell (Slipped) Landed on Right Hand Right Shoulder Pain." Ex. 31.

8.  ASC flew Mr. Le to Seattle for further shoulder treatment. On March 2, 2005, Mr. Le underwent an MRI. The radiologist, Tuyen Hoang, M.D., noted that Mr. Le had a "recurrent dislocation," meaning that he had suffered a prior dislocation 2-3 years ago in addition to his most recent one in February 2005. Ex. A-24, at 2. Dr. Hoang concluded that Mr. Le had an "acute-on-chronic anterior shoulder dislocation." *Id.* at 3. Dr. Hoang noted that "[t]he presence of marrow edema underlying a Hill-Sachs defect suggested an acute injury. However, the complete absence of the anterior-inferior labrum and presence of small structures within the anterior-inferior joint, representing worn down labrum or synovial irregularity, suggests that this represents an old injury." *Id.*

9.  On March 4, 2005, Mr. Le filed a second injury report with the assistance of Kelly Soderberg, the sister of Mr. Le's live-in girlfriend. In it, he provided a more detailed account of the February 17 incident:

> I was loading the box[i]lator, and a box fell from it. This was probably due to the fact that the boat . . . was at a tilt (listed), making it difficult for boxes to stay on box[i]lator shelves that are not level—I stopped the boxelator, and reached for the fallen box. I slipped and landed on right hand, this gave me right shoulder pain. As I slipped, I hit my left ear on a bottom edge of a table. This later gave me discomfort. I filled out a report form like this one with Alan Davis . . . . My shoulder was in a[]lot of pain, and I forgot to

ORDER – 3

> mention the discomfort I felt in my left ear.  I told Alan 1½ hours later (upon waking up from having my dislocated shoulder reset) about my left ear.  He said to talk to Bob Lang [ASC's Claims Manager] in Seattle.  I am in the process of contacting Bob Lang right now.

Ex. 37.  According to Mr. Le, the ice on the floor and the box that fell caused his injury. *Id.* ASC responded by sending Mr. Le for treatment with otolaryngologist, Jonathan Chinn, M.D., and later to Charles Fulmer, Au.D., for a CROS hearing aid.

10. On March 14, 2005, Dr. Chinn examined Mr. Le, who complained of left-ear hearing loss, vertigo, and tinnitus.  Through an interpreter, Mr. Le told Dr. Chinn that something had gotten stuck in his ear but was unable to say what it was and had trouble describing the events leading to the injury.  Dr. Chinn discovered a scab on the tympanic membrane of Mr. Le's left ear.  An audiogram confirmed that Mr. Le had total hearing loss in his left ear.  Mr. Le told Dr. Chinn that he had never had hearing problems before the February 17, 2005 incident.

11. On April 8, 2005, orthopedic surgeon, Charles Peterson, M.D., performed a surgical repair of Mr. Le's right shoulder.  Dr. Peterson confirmed Dr. Tuyen's diagnosis of a pre-existing shoulder condition and found that Mr. Le's right anterior-inferior labrum was completely missing.  Ex. 55, at 9-11.

12. On November 3, 2005, Mr. Le underwent another MRI on his shoulder.  Dr. Peterson noted that the MRI showed no significant pathology and that Mr. Le's shoulder felt stable.  *Id.* at 40  On December 17, 2005, Dr. Peterson noted that Mr. Le's range of motion was nearly back to normal, his shoulder showed no instability, and that no further treatment was necessary.  *Id.* at 41.  Dr. Peterson added that Mr. Le "is able to lift more than [the] 20 lb[s.] he states."  *Id.*  On December 19, 2005, Dr. Peterson noted that Mr. Le was at maximum medical improvement and released him to work.  *Id.* at 42.

ORDER – 4

13.     Mr. Le is the only person to testify that on February 17, 2005, there was listing of the ship, ice at his work station, and that he suffered an ear injury. His testimony is, however, inconsistent and unreliable.

14.     During this litigation, Mr. Le has taken the position that he reached into the mouth of the boxilator to retrieve a fallen box that was stuck either at the level of the floor or at the level of the conveyor belt/rollers; in his effort to pull the box loose, he fell backward on the icy deck and landed either on his right hand or shoulder; and he struck his head or his left ear. In his two injury reports, however, Mr. Le makes no reference to reaching into the boxilator to dislodge a box.

15.     In his second injury report and in his deposition, Mr. Le said that he struck his ear on the "table"/conveyor belt. *See* Ex. 37; Le Dep. at 96. At trial, Mr. Le suggested that, in looking at photographs of the freezer hold, he must have struck his head or ear on a pole. The conveyor belt and the pole stand in different directions vis-a-vis where Mr. Le was stationed.

16.     Mr. Le cannot, in fact, recall anything from the point he began falling until about five minutes later.

17.     Mr. Le was wearing a hard hat at the time of his injury. No crewmember or treating medical personnel noticed an injury to his ear. No foreign body that might have entered his ear has been identified or found.

18.     Mr. Le believed that Mr. Mills, who was working directly across from him, saw Mr. Le attempt to dislodge the box from inside of the boxilator and fall. *Id.* at 88.

19.     Mr. Mills did not see or hear a box fall, and did not see Mr. Le reach into the boxilator to dislodge a stuck box. Mr. Mills did not see Mr. Le fall and dislocate his shoulder or hurt his ear. Mr. Mills noticed that the boxilator had stopped and looked up. Mr. Le stood hunched over and was holding his arm. When Mr. Mills asked what had

ORDER – 5

happened, Mr. Le said that his arm hurt. Mr. Mills asked if Mr. Le had fallen and Mr. Le responded that he had not. Mr. Mills directed Mr. Le to seek medical assistance and left the freezer hold himself to find a processor to take Mr. Le's position at the boxilator. Mr. Mills was the only person in the freezer hold with the opportunity and the vantage point to witness the incident either directly or through his peripheral vision.

20.     Crewmember Aaron Co's videotaped testimony contradicts Mr. Mills' account of the incident. According to Mr. Co, as soon as the conveyor belt stopped, he saw Mr. Le seated on the ground, where Mr. Le remained for two minutes. Mr. Co purportedly escorted Mr. Le from the freezer hold to Mr. Le's onboard room, went to "rest" for an unspecified period of time, then spoke to Mr. Mills about the incident. According to Mr. Co, Mr. Mills said that a box was stuck and Mr. Le slipped and fell while trying to dislodge it. Co Dep. at 37-38. Mr. Mills does not recall ever having this conversation with Mr. Co.

21.     Mr. Mills' testimony is more credible than Mr. Co's. When Mr. Co first spoke to ASC's counsel, he could recall neither which side of the conveyor belt Mr. Le was working on nor whether Mr. Le was lying down or kneeling after the accident. Co Dep. at 50, 55. Though Mr. Le was directed to seek medical attention, Mr. Co did not escort him to see Charlie Dietrich; that duty fell upon another Vietnamese-speaking crewmember. Mr. Co instead returned to the freezer hold to have a conversation with Mr. Mills in which Mr. Mills described with remarkable specificity details that Mr. Le himself never wrote down in his injury reports and proposed only during this litigation.

22.     ASC held safety meetings before every offload in which the processors were instructed on how to deal with concerns with traction, including standing on top of fiber or boxes of product. Mr. Mills testified that there was no ice where he was working, which was only a few feet from Mr. Le's workspace. Mr. Davis testified that he went to

ORDER – 6

the freezer hold within hours of the accident, found no signs of ice on the deck, and noticed that the processors were standing on boxes of product. Mr. Le was wearing a hard hat and freezer boots, never before complained about traction, and presented no evidence that other processors have slipped and fallen in the freezer hold. Mr. Le's own recollection of his "fall" is so murky that he cannot recall in which direction he fell, whether he landed on his hand or shoulder, and what he struck, if anything, on the way down.

23.     Prior to 2001, there was a problem with boxes falling in the boxilator shaft and injuring processors such as Mr. Mills, who broke fingers in such an incident. ASC addressed that design defect in October 2000 by installing safety bars that shut off the boxilator if a box is not inserted all the way into it. Mr. Le did not present evidence of anyone other than himself being injured since 2001 by boxes falling from the boxilator. The testimony of Mr. Le's expert witness, Captain Charles Jacobsen, was unreliable. Captain Jacobsen never inspected the JAEGER's boxilator, has never been in the JAEGER's freezer hold, and had no idea who manufactured the JAEGER's boxilator. He has never before testified about a boxilator and the last time he worked with a boxilator was over a decade ago for approximately twelve hours.

24.     Mr. Le injured his right shoulder either pushing boxes into the boxilator or by falling onto his outstretched right hand. The most significant cause of his shoulder dislocation was pre-existing shoulder damage, including a ground-down anterior-inferior labrum. The accident was not caused by ice that created unsafe, slippery conditions; by the vessel listing to one side; or by the flawed design of the boxilator.

25.     Mr. Le has been less than forthright about his prior shoulder and ear injuries.

26.     In November 2001, Mr. Le suffered an injury caused by his wife striking his elbow while he was cleaning his ear with a cotton swab. Ex. 56 at 9. The impact resulted in an

ORDER – 7

acute perforation of his left tympanic membrane for which he was treated in the emergency room at North Bay Hospital in Florida. His complaints included pain, dizziness, nausea, and ringing in his ear. *Id.* at 4.

27. In January 2004, Mr. Le underwent an industrial hearing examination, which showed that he suffered from moderately severe to severe hearing loss in his left ear. After the examination, Mr. Le admitted to crewmember/girlfriend Erin O'Dell that in 2002, while aboard the JAEGER, he had lost hearing when falling pan liners knocked him down and his head hit the metal on the ground. O'Dell Dep. at 80-81.

28. In its interrogatories, ASC requested a list of all the physicians Mr. Le had seen in the ten years before the incident. Mr. Le responded by providing the name of the hospital that treated him for his perforated eardrum, but he described the reason for treatment as "an ear infection." Ex. A-8 at 4.

29. Mr. Le stated that before February 17, 2005, he never suffered from any hearing loss in his left ear, or, at least, that he never noticed any difference between his left and right ears. Le Dep. at 20.

30. That statement's veracity has been called into question by Ms. O'Dell's testimony, the 2004 audiogram, and his own counsel's closing argument. Mr. Le failed to disclose any prior hearing loss to Dr. Chinn in March 2005 or during the independent medical examinations. His own medical expert, Alan Langman, M.D., opined that Mr. Le suffered from hearing loss prior to the February 2005 incident. Dr. Langman also conceded that Mr. Le may have been deaf in his left ear prior to the incident; Mr. Le had not been frank regarding his medical history; and the hearing in a damaged ear has a greater propensity to deteriorate than the hearing in an undamaged ear.

31. Mr. Le admitted that he suffered a shoulder separation while aboard the JAEGER in 2002. Le Dep. at 16. He never reported this injury.

ORDER – 8

32.     Before each season on the JAEGER, Mr. Le filled out a medical history and healthcare questionnaire. Ex. A-30. In each questionnaire from 2002 to 2005, Mr. Le failed to disclose prior shoulder or ear injuries in response to queries as direct as "Have you ever been injured on or off the job?" and "Have you seen a doctor in the past 5 years?" *See id.* at 5. The January 2002 questionnaire was in the Vietnamese language.

33.     As of February 17, 2005, Mr. Le was either already deaf in his left ear or his hearing was compromised such that nothing that occurred onboard the JAEGER on that day contributed to further hearing loss. Constantine Palaskas, M.D., opined that Mr. Le was more probably than not already deaf in his left ear as of the January 2004 industrial hearing examination. Dr. Palaskas noted that the 2004 audiogram was not "screened" and, therefore, the minuscule, residual left-ear hearing shown in the test results was consistent with a crossover effect, i.e., Mr. Le's good right ear picked up sound that could not be picked up by Mr. Le's deaf left ear. Dr. Chinn's March 2005 report of a scab on Mr. Le's left eardrum cannot, given the record, support a finding that what occurred on February 17, 2005 caused Mr. Le's left ear problems. Mr. Le's ear canal showed no signs of contemporaneous injury, no one noticed such an injury, and such scabs on the eardrum are not necessarily the result of a traumatic injury.

34.     Mr. Le has exaggerated his right shoulder injury. After his employment with ASC, Mr. Le ran and operated his own restaurant from November 2005 to June 2006 in which he cooked, picked up supplies, cleaned, bussed tables, acted as the host, worked the cash register, and served food. He worked at least six days a week for 10-12 hours a day without difficulty or further pain complaints.

35.     A March 2005 MRI and Dr. Peterson's operative notes show that Mr. Le had a pre-existing shoulder condition that predisposed him to future shoulder dislocations.

ORDER – 9

Credible medical testimony by his treating physician, Dr. Peterson, and ASC's rehabilitation expert, Aleksandra Zietak, M.D., shows that Mr. Le has regained at least the same level of functionality in his shoulder that he had prior to his February 17, 2005 injury.

36. Mr. Le's claim that his failure to understand the English language contributed to the many inconsistencies in his testimony lacks credibility. Mr. Le testified live both with and without a Vietnamese-language interpreter. Without an interpreter, Mr. Le was able to comprehend the questions and communicate his answers effectively. He filed a detailed second injury report in March 2005 without the assistance of a Vietnamese translator. Mr. Le has been assisted by counsel throughout this litigation and made many of his inconsistent statements through an interpreter.

37. ASC did not fail to provide a safe workplace, to supervise, or to provide a safe offload procedure.

38. Mr. Le has been capable of returning to his previous occupation as a processor aboard the JAEGER since December 19, 2005.

39. Mr. Le received maintenance at the contractually agreed upon rate of $25.00 per day until December 19, 2005. Maintenance ended when Mr. Le reached maximum medical cure on December 19, 2005.

40. ASC has paid all medical expenses Mr. Le has presented.

## II. Conclusions of Law

1. The court has jurisdiction over this case based on the Jones Act, 46 U.S.C. § 30104, the general maritime law, and 28 U.S.C. § 1333. The Western District of Washington is the proper venue for this case.

2. The Jones Act provides a cause of action in negligence for seamen injured in the course of employment. To prove negligence under the Jones Act, a plaintiff must show

ORDER – 10

duty, breach, notice, and causation. *See Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 662 (9th Cir. 1997). The mere fact that a seaman suffers an injury does not create liability; rather, the seaman must prove the existence of negligence on the part of his employer. *See Caldwell v. Manhattan Tankers Corp.*, 618 F.2d 361, 363 (5th Cir. 1980). To recover, a seaman must prove that his employer's negligence played a part in producing his injury. *See Ribitzki*, 111 F.3d at 664.

3.     Mr. Le failed to meet his burden to establish that his injury was caused by ASC's negligence. Mr. Le failed to show how the vessel's list and alleged ice in his workspace played a role in causing or aggravating his injuries. Several witnesses testified credibly about the training and measures taken by processors to deal with traction issues in the freezer hold and Mr. Le never countered with evidence of other processors suffering from traction issues. Mr. Le failed to prove that the boxilator or the vessel's offload procedure was unsafe, or that a modification to the offload machinery would have prevented the alleged accident. Mr. Le also failed to show that ASC failed to supervise its crew properly or to provide a safe workplace.

4.     Mr. Le's claim for Jones Act negligence is dismissed with prejudice.

5.     "A shipowner has an absolute duty to furnish a seaworthy ship." *Ribitzki*, 111 F.3d at 664. To be seaworthy, a vessel must be "reasonably fit for its intended use." *Id*. "[T]here is no presumption that a ship is unseaworthy merely because an accident has occurred on it . . . ." *Villers Seafood Co., Inc. v. Vest*, 813 F.2d 339, 342 (11th Cir. 1987). An owner is not obligated to furnish an accident free ship: "The standard is not perfection, but reasonable fitness . . . ." *Mitchell v. Trawler Racer, Inc*., 362 U.S. 539, 550 (1960). "In other words, a seaman is not absolutely entitled to a deck that is not slippery. He is absolutely entitled to a deck that is not unreasonably slippery." *Lieberman v. Matson Navigation Co*., 300 F.2d 661 (9th Cir. 1962) (quotation marks and

ORDER – 11

citation omitted). Ice in a freezer, or the slight list created by a vessel offload are conditions with which seamen must cope when they make their livelihoods in the fishing industry. *See Connorton v. Harbor Towing Corp.*, 237 F. Supp. 63, 65 (D. Md. 1964); *Colon v. Trinidad Corp.*, 188 F. Supp. 97, 100 (S.D.N.Y. 1960).

6. To succeed on a claim of unseaworthiness, a plaintiff must prove: "(1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." *Ribitski*, 111 F.3d at 664. To show causation, a plaintiff must prove, "that the unseaworthy condition was a substantial factor in causing the injury." *Id.* at 665. Mr. Le failed to establish by a preponderance of the evidence, how the alleged accident occurred. He failed to establish that the boxilator (as designed and operated), ice on the deck, or the vessel's list were substantial factors in causing his injury. Mr. Le also failed to establish that ASC did not provide him with a safe work environment. Mr. Le has, therefore, failed to meet his burden of proving that the JAEGER was unseaworthy.

7. Mr. Le's claim for unseaworthiness is dismissed with prejudice.

8. Mr. Le has received all of the maritime benefits of maintenance and cure to which he is entitled. Based on the records of Dr. Peterson and the testimony of Drs. Palaskas and Zietak, Mr. Le reached maximum medical improvement in December 2005.

9   ASC contends that Mr. Le committed fraud by filing suit for total left ear hearing loss, tinnitus, vertigo, and balance issues, all of which he claimed were caused by falling aboard the JAEGER on February 17, 2005. To recover for fraud under the federal common law, the following elements must be proven by clear and convincing evidence: "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the

ORDER – 12

representation." *Pence v. United States*, 316 U.S. 332, 338 (1942); *Barr Rubber Prods. Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1120 (2d Cir. 1970); *Graham v. Renbrook School*, 692 F. Supp. 102, 107 (D. Conn. 1988). To recover for fraud under Washington law, the following elements must be proven by clear, cogent and convincing evidence: (1) a representation; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) an intent that it be acted on by the person to whom it is made; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) the right to rely thereon; and (9) consequent damage. *Markov v. ABC Transfer & Storage Co.*, 457 P.2d 535, 539 (1969). "Failure to prove any one of the nine stated elements is fatal to recovery. Fraud, therefore, is never presumed; to be clear, cogent and convincing, the evidence must be greater than a mere preponderance." *Id.* (citations omitted).

10. ASC has not met this high burden of proof on its counterclaim for fraud. Contrary to ASC's assertion, the medical records from North Bay Hospital does not establish that Mr. Le suffered profound hearing loss in 2001 as the result of a perforated tympanic membrane. The intake form noted that Mr. Le presented with pain in his ear, nausea, and dizziness but that he "*denies any drainage + hearing [loss]*." Ex. 56, at 4 (emphasis added). The doctor's discharge notes provided simply that he "take meds as ordered." *Id.* at 10. Although it was disingenuous for Mr. Le to suggest in his answers to interrogatories that he had been treated only for an "ear infection" rather than for a perforated eardrum, the statement allowed ASC to investigate his loss of hearing claim more closely and was not necessarily false. A perforated ear drum may lead to an ear infection, and either condition may or may not lead to hearing loss. Although the 2004 industrial screening exam suggested that Mr. Le had moderately severe to severe hearing loss, Drs. Chinn and Palaskas agreed that many people with congenital or early-childhood hearing loss compensate so well for their disability that they do not realize their own

ORDER – 13

partial or even complete deafness in one ear. Dr. Palaskas opined that Mr. Le's tinnitus might actually be a symptom of Mr. Le's *shoulder* injury due to tension in his muscles. A layperson might not suspect that a symptom experienced in his or her ear would result from an injury to another part of the body, particularly given an otolaryngologist's opinion that the condition was related to one's ear. And though Mr. Le may have suggested to Ms. O'Dell that he suffered some hearing loss as the result of a 2002 incident involving pan liners aboard the JAEGER, any such concerns did not affect his ability to work and did not cause him to seek medical attention. When it was his burden of proof, Mr. Le could not show by a preponderance of the evidence that his left ear symptoms were the result of the February 17, 2005 incident aboard the JAEGER. With the burden of proof shifted, ASC cannot show by clear, cogent and convincing evidence that Mr. Le knowingly misrepresented his ear problems.

11.     ASC also seeks recovery on the basis of unjust enrichment for the expenses involved with Mr. Le's left-ear claim. A person has been unjustly enriched when he or she, contrary to equity, has profited or enriched himself at the expense of another. *See Farwest Steel Corp. v. Mainline Metal Works, Inc.*, 741 P.2d 58, 64 (Wash. Ct. App. 1987). "Three elements must be established for unjust enrichment: (1) there must be a benefit conferred on one party by another; (2) the party receiving the benefit must have an appreciation or knowledge of the benefit; and (3) the receiving party must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value." *Dragt v. Dragt/DeTray, LLC*, 161 P.3d 473, 482 (Wash. Ct. App. 2007). Courts have broad discretion when fashioning equitable remedies. *King County v. Seawest Inv. Assoc., LLC*, 170 P.3d 53, 58 (Wash. Ct. App. 2007).

ORDER – 14

12. The court found Mr. Le's testimony to be not credible. Nevertheless, it is undisputed that Mr. Le injured his shoulder on February 17, 2005, and that injury, according to ASC's expert witness Dr. Palaskas, is a likely cause of Mr. Le's tinnitus. Because it paid maintenance for Mr. Le's shoulder injury, ASC did not occur additional maintenance expenses based on his ear claim. Under these circumstances, ASC has failed to show that it would be inequitable for Mr. Le to retain the $3,765.37 that ASC spent in curative treatment for his ear. The court also declines to order Mr. Le to reimburse ASC for its expenses in defending the ear claim. The most damning evidence against Mr. Le's left ear claim, the 2004 audiogram, was an easily discoverable screening exam conducted at ASC's behest. Furthermore, ASC obtained the 2001 North Bay Hospital records because Mr. Le revealed his treatment there for an ear condition.

13. ASC's counterclaims for fraud and unjust enrichment are dismissed with prejudice.

14. Mr. Le's complaint is dismissed with prejudice and without costs to either party.

Dated this 21st day of December, 2007.

JAMES L. ROBART
United States District Judge

ORDER – 15